**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HENRY UDOEWA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3054 |
| | § | |
| PLUS4 CREDIT UNION, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is an employment discrimination case.  Henry Udoewa sued his former employer, Plus4

Credit Union, and two of its officers: the president and chief executive officer, Vladimir Stark; and

the executive vice-president, Patricia Collins.  Udoewa is a black man born in Nigeria.  He alleges

that he was subjected to race and national origin discrimination, including a hostile work

environment, and retaliated against, all in violation of 42 U.S.C. § 1981.[1]  He also asserts Texas

common-law claims for negligent retention and defamation.  Udoewa alleges that the defendants

violated § 1981 by: (1) failing to promote him to the position of executive vice-president and instead

promoting Collins, a Caucasian female; (2) removing his duties as vice-president of human

resources and transferring those duties to Collins; (3) maintaining a racially hostile work

environment; (4) retaliating against him for refusing to aid Plus4's investigation of discrimination

claims filed by a former employee who, like Udoewa, was from Nigeria; and (5) firing him.

Udoewa further alleges that Plus4 negligently hired and retained Stark.  Finally, Udoewa alleges that

---

[1] Udoewa has not alleged violations of Title VII because he did not exhaust his administrative
remedies as required by 42 U.S.C. § 2000e-5(f)(1).

Stark defamed him.   After discovery, the defendants moved for summary judgment on all

Udoewa's claims.[2] Based on a careful review of the pleadings; the motion, response, and reply; the

record; and the applicable law, this court grants Plus4's motion for summary judgment.[3]   The

reasons are explained in detail below.

## I.       The Summary Judgment Evidence[4]

Plus4 is a Houston credit union.   Originally, it was called the "Houston Postal Credit Union"

because it served the financial needs of Houston's postal workers.   It later expanded to a general

clientele.   Plus4 is controlled by a board of directors, but the president and chief executive officer,

Vladimir Stark, manages Plus4's day-to-day operations in conjunction with the senior management

team.   Stark, the president and CEO, was born in Liberia.   Although Udoewa's counsel asserts that

Stark is not "black," Stark clearly describes himself as black.   (Docket Entry No. 109, Ex. W, Stark

Affidavit II, ¶ 3).   Other Plus4 employees and board members knew that Stark was from Africa and

---

[2] The defendants' motion for summary judgment is filed at Docket Entry No. 83. Udoewa responded, (Docket Entry Nos. 98, 99), and the defendants replied, (Docket Entry No. 109).

[3] The defendants moved to strike certain of Udoewa's summary judgment evidence. (Docket Entry No. 108). Although specific objections are considered later in this opinion, as a general matter, the defendants are entitled to summary judgment even if the challenged portions of Udoewa's summary judgment are considered. This motion is denied as moot.
    The defendants also moved to strike Udoewa's expert witness designation as untimely filed, (Docket Entry No. 82). This motion is also denied as moot; the parties did not cite, and this court did not consider, the expert report in addressing the summary judgment motion.
    Finally, Udoewa moved to strike an expert report submitted by the defendants on the ground that the defendants' designation of the expert was untimely.   (Docket Entry No. 91).   In ruling on this summary judgment motion, this court did not consider the defendants' expert report.   This motion to strike is also denied as moot.

[4] Both parties attached voluminous summary judgment evidence but only cited limited parts of the evidence in their motions and briefs. Federal Rule of Civil Procedure 56 does not obligate a court to search the record for uncited evidence supporting a party's motion for, or opposition to, summary judgment. *See Pita Santos v. Evergreen Alliance Golf Ltd.*, 650 F. Supp. 2d 604, 611 n.1 (S.D. Tex. 2009).

considered him to be black.  (Docket Entry No. 100, Ex. 2, Collins Depo., 101; Ex. 1A, Udoewa

Depo. II, 63).

Udoewa came to the United States in 1976 from Nigeria.  He received a B.A. in Business

Administration with an accounting concentration from Texas Southern University in 1980 and an

M.B.A. from Prairie View A&M University in 1983.  In April 2001, Stark hired Udoewa as an

accounting supervisor.[5]  (Docket Entry No. 100, Udoewa Depo. Vol. I, 29–32); (Docket Entry No.

99, Ex. 6, Employee Evaluation Reports).  Stark promoted Udoewa twice during the first two years

of his employment at Plus4.  On April 22, 2002, Stark promoted Udoewa to the position of

accounting supervisor.  On January 29, 2004, Stark promoted Udoewa to the position of vice-

president of accounting, making him part of Plus4's senior management team.  (Docket Entry No.

83, Ex. B, Stark Depo., 27–28).

From the start of his employment, Udoewa received high scores from Stark in regular

employee-evaluation reports.  Stark filled out all the reports.  The evaluation reports included ten

"performance criteria" scored on a ten-point scale to produce a combined score of 100 possible

points.[6]  For April 17, 2001 to April 17, 2002, Udoewa received a combined score of 95; for April

17, 2002 to February 1, 2003, he received a combined score of 98.5; for February 1, 2003 through

February 1, 2004, he received a combined score of 99; and for February 1, 2004 through January

31, 2005, he received a combined score of 100.  Under Plus4's scoring system, these combined

---

[5]  When Udoewa began his employment, Plus4 Credit Union was still known as the "Houston Postal Credit
Union."

[6]  The categories were: job knowledge; ability to plan, organize, and establish objectives; quality of
performance and ability to meet goals; initiative and capacity to develop; managerial and leadership ability;
judgment; ability to communicate; adherence to policy; development of subordinates; and employee relations.
(Docket Entry No. 99, Ex. 6, Employee Evaluation Reports).

scores demonstrated "Excellent Performance." (Docket Entry No. 99, Ex. 6, Employee Evaluation Reports).

Udoewa continued to receive more responsibilities at Plus4. On August 16, 2004, Stark made Udoewa responsible for overseeing Plus4's human resources department in addition to his responsibilities as vice-president of accounting. (Docket Entry No. 83, at 7); (Docket Entry No. 99, Ex. 8, Stark HR Memo). Stark wanted someone from senior management to oversee that department and Udoewa's responsibilities as vice-president of accounting overlapped with some of the human resources department functions, such as payroll. (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 3). Udoewa's human resources department responsibilities were limited. They included overseeing Kimberly Mayfield, the department's director, who continued to handle day-to-day tasks. Udoewa was also responsible for submitting to Stark personnel evaluations and recommendations for hiring, firing, and transferring employees and for adjusting salaries. (*Id.*, Ex. B, Stark Depo., 36–37); (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 136–37).

The parties dispute whether Stark gave Udoewa the title of "vice-president of human resources." Stark testified that Udoewa's title remained only vice-president of accounting when he was given the additional human resources department responsibilities. (Docket Entry No. 83, Ex. B, Stark Depo., 36–37). Udoewa testified that he had the titles of both vice-president of accounting and vice-president of human resources. Udoewa points to minutes from a November 2007 Board of Directors meeting identifying him as "VP of Accounting and HR," (Docket Entry No. 99, Ex. 9, November 2007 Minutes). Udoewa does not assert that his compensation depended on whether he had one or two vice-president titles.

4

After January 31, 2005, Plus4 changed its employee performance evaluation reports. Instead of the ten-point system for scoring ten performance criteria, the reports included a five-point scoring system using seven weighted "performance factors."[7] Under the new system, Udoewa continued to receive high scores on the reports that Stark completed. For February 1, 2005 through January 31, 2006, Udoewa received a 5.0 out of 5.0; for February 1, 2006 through January 31, 2007, Udoewa received a 4.9 out of 5.0; and for February 2, 2007 through June 30, 2008, Udoewa received a 4.9 out of 5.0. Under the new scoring system, Udoewa was a "High Performer" for each period. (*Id.*, Ex. 6, Employee Evaluation Reports).

The new scoring system also measured "future goals" for each evaluation period. Like the performance factors, each future goal was worth five points. The total score was based on the number of points multiplied by a percentage weight assigned to each future goal. For example, for the period from February 1, 2006 to January 31, 2007, Udoewa's future goals included growing deposits by $20 million, weighted at 15%, and getting Plus4 named as a "best work place," weighted at 5%. Udoewa's total "goal performance" score for this period was 2.6; his score for February 2, 2007 through June 30, 2008 was 2.55. While these scores were lower than the performance scores, they apparently did not lower his total "Performance Rating" from "High Performer." (*Id.*).

The record contains disputed evidence about two remarks made by Patricia Collins, a Caucasian female who was Plus4's vice president of collections from at least 1999 until her promotion to executive vice president in 2008.[8] Udoewa alleged that sometime in 2007, after he

---

[7] The performance factors were: core values, weighted at 50%; communication, weighted at 10%; decision-making and judgment, weighted at 10%; job knowledge, weighted at 10%; leadership, weighted at 10%; budget development and control, weighted at 5%; and employee development, weighted at 5%. (Docket Entry No. 99, Ex. 6, Employee Evaluation Reports).

[8] The record does not indicate when Collins began serving as Plus4's vice-president of collections. She did, however, receive an email from Stark in 1999 identifying her as vice-president of collections. (Docket Entry

5

returned from a trip to Nigeria, Collins told him "that she wished the [United States] Department of Homeland Security would have refused [Udoewa] entry into the United States and keep [his] black ass in Black Africa." (*Id.*, Ex. 37, Udoewa Aff., ¶ 12). Collins vigorously denies ever making such a statement. (Docket Entry No. 100, Ex. 2, Collins Depo., 98). Udoewa also stated in his affidavit that the chair of Plus4's Board of Directors, Ceaser Moore, stated during a April 2008 meeting with Stella Thompson, who was Plus4's human resources director at the time, that Udoewa was from the "bush part of Africa." (Docket Entry No. 99, Ex. 37, Udoewa Aff., ¶ 12). In his deposition, Udoewa testified that Moore's entire statement was that Udoewa "came from the bush part of Africa while Mr. Stark came from the dictatorship [part] of Africa." (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 63). Moore testified that he does not remember making this statement. (*Id.*, Ex. 3A, Moore Depo., 191). Udoewa asserts that Moore made a similar statement on June 12, 2008. (Docket Entry No. 99, Ex. 37, Udoewa Aff., ¶ 13).

Udoewa stated in his affidavit that on September 4, 2007, he asked Stark to promote him to the position of executive vice-president. Udoewa stated that he approached Stark and requested this promotion. (*Id.*, ¶ 32). In his earlier deposition, however, Udoewa testified that on that date, he asked Stark about being promoted to the position of chief executive officer on Stark's retirement. (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 263–65). Udoewa testified in his deposition that Stark responded that he could not be promoted from his position as vice-president of accounting until Claudia Cruz, an accounting manager, received her bachelor's degree so that she could take Udoewa's place. A college degree was a requirement for the vice-president position. (Docket Entry

No. 99, Ex. 21, Pat Fendley Verbal Warning Email). The record also indicates that though Collins was promoted to executive vice-president, she retained responsibility over collections. (Docket Entry No. 100, Ex. 2, Collins Depo. 142).

No. 109, Ex. Z, Udoewa Depo. II, 263–65).  Udoewa testified that he helped Cruz enroll in the necessary courses, but does not state whether she received her B.A.  (Docket Entry No. 99, Ex. 37, Udoewa Aff., ¶ 32).

In May 2008, Stark promoted Collins to the position of executive vice-president.  (*Id.*).  Udoewa believes that when Stark told him that he was waiting for Cruz to complete her degree to promote her to the vice-president of accounting position, Stark was actually waiting for Collins to complete her degree so that he could promote her to the executive vice-president position.  (Docket Entry No. 99, at 14).  Udoewa argues that he was objectively more qualified than Collins for the executive vice-president position.  Udoewa had a graduate degree (an M.B.A.) as well as a B.A., and his degrees were from Prairie View A&M and Texas Southern University.  Collins had only obtained her B.A. recently, by taking online courses.  Udoewa also asserts that Collins had problems while working as Plus4's vice-president of collections.  Udoewa cites a 1999 memo from Stark describing an oral warning Collins received about Plus4's delinquency ratio, (*id.*, Ex. 21,  Pat Fendley Verbal Warning Email).[9]  Udoewa also cites Collins's deposition testimony that Plus4 has "always had high delinquencies,"[10] that in 2008, the debt-collection department was "underperforming," that she oversaw automobile loans and that Plus4 incurred losses from those loans,[11] and that during 2008 she had placed a number of loans "in suspense" after receiving notice

_____

[9]  The email is from "Jim Stark" and sent to "Pat Fendley."  Vladimir Stark also goes by the name "James Stark."  Patricia Collins was "Patricia Fendley" before she married.  *See* (Docket Entry No. 98, at 22 n.2).

[10]  In his response to the defendant's motion for summary judgment, Udoewa cites to page 57 of Collins's deposition for this point.  (Docket Entry No. 98, at 22).  He did not, however, include page 57 of Collins's deposition in the excerpts submitted to this court.  In the deposition excerpts Udoewa did submit, Collins stated "Yeah, we've had delinquencies since the . . . opening of the credit union.  There's always going to be delinquencies in loans."  (Docket Entry No. 100, Ex. 2, Collins Depo., 119).

[11]  In his response to the defendants' motion for summary judgment, Udoewa argues that under Collins's supervision, Plus4 suffered a $9,000,000 loss in automobile loans.  (Docket Entry No. 98, at 22).  In her

7

that a debtor had sent a check to reduce the delinquency ratio and that some of the loans remained in that status for more than sixty days without her knowledge.  (Docket Entry No. 100, Ex. 2, Collins Depo., 119, 140–43).  Udoewa also relies on Collins's testimony that Plus4 had $9,000,000 in losses in 2009, (*id.* at 118); and a form that showed that after Collins's husband was arrested on a drug-related charge,[12] she was briefly suspended from work with pay, (*id.* at 14–16).

Stark testified that he promoted Collins instead of Udoewa to the executive vice-president position because she had worked longer at Plus4 (eight years longer than Udoewa); she had more experience with credit unions; she had more experience in "overall operations"; she had worked much more extensively with board members than Udoewa; and she worked better under pressure. (Docket Entry No. 83, Ex. B, Stark Depo., 102–03).  The defendants also point out that while Udoewa had accounting experience, Collins had much more extensive lending experience.  (Docket Entry No. 99, Ex. 6, Employee Evaluation Reports).  Collins began working at Plus4 on September 7, 1993, approximately eight years before Udoewa started.  (Docket Entry No. 100, Ex. 2, Collins Depo., 27).  Before working at Plus4, Collins worked for Communicators Federal Credit Union and Wilsco Federal Credit Union.  (*Id.*, 28–29).[13]

The defendants also respond to the criticisms Udoewa makes about Collins's performance at Plus4 before her promotion.  The defendants cite record evidence that delinquency rates are normal for postal credit unions such as Plus4.  (*Id.*, 119).  The defendants also point out that some

---

deposition, however, Collins testified that Plus4 wrote off $9,000,000 in losses for 2009, some of which came from automobile loans.  (Docket Entry No. 100, Ex. 2, Collins Depo., 117–19).

[12]  Collins testified that she could not remember the year of her husband's arrest.  She divorced him in 1995. (Docket Entry No. 100, Ex. 2, Collins Depo., 7, 11).

[13]  Collins was a membership services representative at Wilsco.  At Communicators, she held the following positions: teller, head teller, branch manager, collector, loan officer, and building manager.  (Docket Entry No. 100, Ex. 2, Collins Depo., 28–29).

of the evidence Udoewa cites concerns events after the promotion decision, making it irrelevant to Plus4's reasons for that decision.  The defendants also assert that to the extent that the evidence concerns Collins's husband and not her, it is also irrelevant.

Shortly after Collins was promoted, on May 23, 2008, Stark changed Udoewa's title to "chief financial officer/vp of accounting," adding the title of chief financial officer.  (Docket Entry No. 83, Ex. J, May 23, 2008 Stark email).  The record does not indicate whether the addition of this title increased Udoewa's salary or what added duties resulted.  Three days later, Udoewa's human resources department responsibilities were removed from him and transferred to Collins.  (Docket Entry No. 83, Ex. B, Stark Depo., 38–39).  The defendants assert that this occurred because of Udoewa's "failure to properly supervise" Stella Thompson, who had replaced Sheila Mayfield, the previous director of human resources, after she abruptly resigned.  (Docket Entry No. 83, at 29).  On Udoewa's recommendation, Stark had hired Thompson to take Mayfield's place on March 31, 2008.  Thompson, who like Udoewa was from Nigeria, had no prior human resources experience.  Under Plus4 employment policies, new hires have a performance review 90 days after they begin employment to "determine if they have completed his/her training period satisfactorily or if they are in need of additional supervision."  (*Id.*, Ex. E, Plus4 Credit Union Personnel Policies).  The defendants assert that under this policy, Thompson's employment was probationary during the first 90 days.  (Docket Entry No. 83, at 8).  Stark testified that during Thompson's first 90 days of working in human resources, she caused low morale among Plus4 employees; had such limited knowledge of laws governing human resources, including how to classify and compensate employees under the Fair Labor Standards Act, that she made many mistakes; and that she made

9

many payroll errors.[14]  (*Id.*, Ex. B, Stark Depo., 39–43).   Stark testified that despite these deficiencies, Udoewa did not bring to his attention any of the problems with Thompson's work. (*Id.*, 40).   The defendants assert that Stark removed Udoewa's human resources department responsibilities because of  "several concerns about Udoewa's supervision," including whether Udoewa had the time needed to supervise Thompson's work, particularly given her limited knowledge of human resources, and whether Udoewa had failed to inform Stark about the problems with Thompson's work.  (Docket Entry No. 83, at 10).

Udoewa questions these stated reasons for transferring his human resources department responsibilities to Collins.  Udoewa points out that Thompson was an emergency hire and that Stark hired her knowing that she had no prior human resources experience.  (Docket Entry No. 100, Ex. 4, Thompson Depo., 73).  Udoewa also argues that at least some of the mistakes Thompson made were minimal and her work would have likely improved with training.  As to the alleged payroll mistakes, Udoewa points to Thompson's testimony that some of those mistakes were not hers but instead were made by a payroll company.  (*Id.*, Thompson Depo., 249–53).

In his affidavit, Udoewa alleged that the reduction in his duties was due to retaliation for two decisions he made that were unpopular with Stark and Plus4 management.  Udoewa had protested Stark's decision to hire Janice Johnson, a relative of the chair of Plus4's board, Ceaser Moore, after Udoewa discovered that she had an arrest for driving while intoxicated.  Udoewa had also refused to hire Niki Moore, Moore's granddaughter, at Plus4.  (Docket Entry No. 99, Ex. 37, Udoewa Aff.,

---

[14]  The defendants included in the summary judgment evidence a list of the payroll errors made by Thompson. The list shows that twenty errors were made between April 4, 2008 and May 30, 2008.  (Docket Entry No. 83, Ex. I, Thompson Payroll Corrections).

¶¶ 4–5).  The alleged retaliation had nothing to do with Udoewa's race or with any conduct protected under federal employment laws.

On May 30, 2008, two months after Collins assumed Udoewa's human resources department responsibilities, Plus4 fired Thompson.  She had been working at Plus4 since March 31.  The defendants argue that Thompson was fired because of performance issues and because she walked out of a meeting with Stark.  (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 4).  Thompson filed a complaint with the Equal Employment Opportunity Commission in June 2008.  The record is unclear as to the complaint specifics, but Udoewa testified that Thompson claimed sexual harassment by Stark.  (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 80).  Plus4 conducted an internal investigation into Thompson's allegations, using outside lawyers.  (*Id.*, 76–77).  Udoewa asserts that in July 2008, two attorneys for Plus4, Terrence B. Robinson and Michael Blalack, "harassed" him by asking him to "give information" about Thompson.  (*Id.*, 83–84).

Stark testified that the request to Udoewa from the lawyers was based on a letter sent to Plus4 from Thompson's attorney stating that she had complained to Udoewa about her treatment at Plus4 before she was fired.  Based on this letter, Blalack and Robinson met with Udoewa to investigate what Thompson had told him.  (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 5).  Neither Udoewa's deposition nor his affidavit refers to this letter, but his response to Plus4's motion for summary judgment does not dispute that Thompson wrote such a letter.  Udoewa asserts that he felt "pressure" to provide information Plus4 could use against Thompson but acknowledges that the lawyers did not ask him to say anything false.  (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 83–84).  Despite his role as a company officer, Udoewa refused to answer the questions the lawyers asked him about his interactions with Thompson during her employment at Plus4.  He asserts that one of the lawyers, Blalack, told him, "How do you think they're going to keep your pay and give

11

you a job here?" and that the other lawyer, Robinson, stated, "I question your integrity." (*Id.*, 81–82).

In June 2008, the same month Thompson filed her complaint with the EEOC, another Plus4 employee, Yolanda Perales, made a complaint that Udoewa had shown her more favorable treatment than he showed other employees, which made her uncomfortable. According to Stark, "Ms. Perales felt she was getting special attention from Mr. Udoewa in her co-workers' presence, which apparently made her feel uncomfortable." (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 6). Perales informed her immediate supervisor, Melissa Havel, who was also a member of the senior management committee. That same day, Havel informed Collins, who in turn informed Stark. (*Id.*, Ex. B, Stark Depo., 140–42). Stark ordered an investigation and met with Udoewa to talk about the matter. It is unclear if Stark talked to Perales before or after his initial meeting with Udoewa. The parties dispute what Stark told Udoewa in this initial meeting and emails exchanged between Udoewa and Stark after the meeting show this disagreement. (*Id.*, Ex. L, June 11, 2008 Emails). Stark's email to Udoewa sent shortly after their meeting states that Udoewa had *not* been accused of sexual harassment but that any allegation of inappropriate conduct had to be taken seriously. (*Id.*). Udoewa's email states that he viewed the accusation as one of sexual harassment. Udoewa demanded a full investigation into the accusation and demanded that the Board of Directors be notified. (*Id.*). Udoewa stated that he believed he had been "framed," and demanded that Collins, Havel, Perales, and Hilton take lie-detector tests. (*Id.*).

As part of his investigation, Stark also met with Perales. She told Stark that she was concerned about several incidents, including one occasion on which Udoewa said "I love you" to Perales in front of another female employee, Misty Hilton; another occasion when Udoewa told Perales that she had on a "nice skirt" in front of another female employee, Veronica Granados; and

another occasion when Udoewa said "what is the secret to open the door" as he held the door open for Perales. (*Id.*, Ex. G, Perales Aff., ¶¶ 4–6). According to Stark, none of this behavior was sexual harassment but it did make Perales uncomfortable because Udoewa did not say similar things to other female employees. (*Id.*, Ex. B, Stark Depo., 140–42). On June 10, 2008, Perales signed a memo stating, "I feel that the instances that were noted were not offensive to myself nor did I feel in any way harassed by Henry Udoewa." (*Id.*, Ex. G-1).

On June 11, 2008, Stark, with Collins present, informed Udoewa that Perales did not intend to pursue any allegations of inappropriate conduct. In an email to Stark sent the next day, Udoewa requested that Perales "put this . . . in writing." (*Id.*, Ex. M., June 12, 2008 Udoewa Email). On June 28, 2010, Udoewa sent a letter to Plus4's Board of Directors to inform them that he felt he had been "framed" and to demand a full investigation into the incident. (*Id.*, Ex. P). In response, Plus4's board asked outside counsel Blalack and Robinson to assist in the investigation. (*Id.*, Ex. C, Moore Depo., 168–170). After interviewing "all of the relevant witnesses," Stark and Plus4 concluded that there was "no evidence . . . reflecting actionable sexual harassment by Mr. Udoewa." (*Id.*, Ex. F, Stark Aff., ¶ 6).

The events giving rise to Udoewa's wrongful termination claim began two months later, when concerns over Plus4's finances became acute. Stark and other members of the senior management team began discussing the best response to the financial difficulties the company faced. Stark stated in his affidavit that Plus4, "not unlike many financial institutions in the current economic environment, realized that it was suffering financial difficulties." Specifically, "Plus4 projected a net loss for 2008 of $3 million due to the downturn in the economy, high expenses, and poorly performing loans." (*Id.*, ¶ 7). The evidence also shows that in 2007, a National Credit Union Administration (NCUA) representative told the Plus4 Board during a "regular visit" that the

company was overstaffed.  (*Id.*, Ex. C, Moore Depo., 68–69).  The defendants assert that "[i]t was necessary that Plus4 abide by NCUA's recommendations to reduce the staff size and because failure to follow their recommendations could result in the loss of the credit union or a possible merger." (Docket Entry No. 83, at 17).  Udoewa does not dispute that there were serious financial problems facing the company.  Indeed, he argues that he "spearheaded a strategy to bring the Credit Union into financial solvency mandated by the State of Texas Department of Credit Union/Credit Union National Administration."  (Docket Entry No. 98, at 1).

To respond to the financial problems, Stark enlisted Collins, Havel, and Udoewa to develop a plan to reduce expenses.  (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 8).  Collins, Havel, and Udoewa had two budget meetings to discuss a plan.  (*Id.*, Ex. R., Minutes of Budget Meetings).  At a meeting held on August 13, 2008, Udoewa recommended across-the-board salary reductions of 25 percent.  (*Id.*, Ex. F, Stark Aff., ¶ 9; Ex. S, Udoewa Memo); (Docket Entry No. 100, Ex. 2, Collins Depo., 44).  Stark also hired Jim Ratzman, a former TCUD deputy commissioner, to assist Plus4 in developing a plan to reduce expenses.  (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 8). Ratzman submitted a report to Stark recommending cuts in various operational expenses totaling $1.1 million.  He did not review expenses related to salary and benefits because he felt that such expenses were the board's responsibility.[15]  (Docket Entry No. 84, Ex. U, Ratzman Report).

---

[15] Udoewa objects to considering the Ratzman report to Stark as part of the evidence about Stark's and Plus4's actions before Udoewa was terminated.  Udoewa bases his objection on the date of the transmittal email for the Ratzman report.  That date is July 28, 2009, nearly one year after the decision to fire Udoewa. Udoewa argues that if anything, it provides evidence that after eliminating his position on the basis of a need to save money, Plus4 continued to spend and still needed to reduce its operational costs.  In an affidavit attached to the defendants' reply brief, Stark explained that the report was attached to an email Ratzman sent on November 21, 2008.  When Stark later saved the document to a computer, the date was automatically changed.  (Docket Entry No. 109, Ex. W, Second Stark Aff., ¶ 5).  The content and context of the report and email are consistent with it being sent to Stark on November 21, 2008.  This was after Stark fired Udoewa, but the findings in the Ratzman report cover the time period before his termination and are relevant.

Stark states that after considering the budget meetings, Ratzman's report, and Udoewa's recommendations, he determined that the best way to minimize costs was to have a reduction in force as opposed to a large across-the-board salary reduction. Stark reasoned that "it was better to layoff some employees, rather than cutting salaries across the board, which would end up lowering employee morale." (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 8). Stark asked Collins and Havel to identify the employees under their supervision who would be subject to the layoff, using the following six factors: "(1) positions that could easily be absorbed within their respective departments; (2) positions that could be outsourced at a lesser cost to the organization; (3) positions that provide services with continued losses; (4) individuals that have not performed over and beyond what was expected; (5) tellers and financial representatives with less than one year of experience; and (6) that there were no other positions available to utilize these employees' skill sets." (*Id.*, ¶ 9).

Stark himself made the decision to include Udoewa in the reduction in force. No evidence shows that Collins was involved in this employment decision. (Docket Entry No. 100, Ex. 2, Collins Depo., 99; Ex. 3, Moore Depo., 33; Ex. 5, Stark Depo., 89); (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 10). Stark determined that Udoewa's "duties were amenable to absorption by Plus4's remaining staff, and given his salary level, the elimination of his position represented a good opportunity to achieve significant reduction in overall salary costs to Plus4." (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 10). On August 22, 2008, Collins, at Stark's behest, informed Udoewa that Plus4 had decided to reduce its work force and eliminate the position of vice-president of accounting. (*Id.*, ¶ 11). In addition to Udoewa, eleven other Plus4 employees were terminated. (*Id.*). A document entitled "Analysis of the Layoff," shows the racial/ethnic mix of those laid off as eight Hispanics, two blacks (including Udoewa), and two Caucasians. The same document indicates that of these eleven individuals, eight were laid off because their positions could be absorbed by other employees;

15

one  was laid off because her position could be outsourced; and two were laid off because their positions were "dissolved."  (Docket Entry No. 99, Ex. 14).[16]

Udoewa argues that Moore, Collins, and Stark conspired to reduce his role at Plus4 by removing his human resources department title and duties and then to eliminate his position.  In support, Udoewa points to testimony from Thompson based on her two-month tenure as director of human resources.  Thompson testified that "Moore . . . said that he doesn't like Mr. Udoewa because Mr. Udoewa comes into the meeting and sits like some kind of a maid at the end of the table. . . . And [Stark] told me that Mr. Cesar Moore just said he doesn't like Udoewa.  There were other conversations that came in and that they were going to . . . terminate Mr. Udoewa."  (Docket Entry No. 100, Ex. 4, Thompson Depo., 123).  Thompson testified that Stark told her "that they wanted to use [her] to like get rid of Mr. Udoewa," (*Id.*, 126), clarifying that she meant that she would be the one to "call him in and fire him."[17]  (*Id.*).

Udoewa challenges whether Plus4 intended to pursue cost reductions and whether a reduction in force was the proper approach to that goal.  He points to evidence that Plus4 hired seven

---

[16]  Udoewa challenges the authenticity of this document, which Stark claims to have created.  Udoewa bases his challenge on the file path shown at the end of the document, which appears to be that of a different entity, such as a law firm.  (Docket Entry No. 99, Ex. 14).  The defendants respond that the file path was added during discovery so that defense counsel could save the document.  (Docket Entry No. 109, at 18).  Udoewa also argues that when Collins was shown the "Analysis of Layoff" document during her deposition, she could not determine whether a list of terminated individuals was created before or after the layoff.  (Docket Entry No. 100, Ex. 2, Collins Depo., 55, 63).  The record demonstrates that when Collins made this statement, she was not looking at the "Analysis of Layoff" but was instead looking at a list compiled during discovery of the names and phone numbers of the individuals laid off.  (*Id.*, 61, 63).  The objections are overruled.

[17]  In her deposition, Collins also testified that Stark told her that Moore told him that he wanted to fire Udoewa because "he comes from a place in Nigeria that is contentious."  (Docket Entry No. 100, Ex. 4, Thompson Depo., 308).  Neither party has cited to this portion of her deposition.  This court does not consider this statement as competent summary judgment evidence.  Federal Rule of Civil Procedure 56 does not obligate this court to search for evidence to support a party's motion for summary judgment.  "'Judges are not like pigs, hunting for truffles . . . .'" *de la O v. Hous. Auth.*, 417 F.3d 495, 501 (5th Cir. 2005) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *see also Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc.*, 695 F.2d 839, 846–47 (5th Cir. 1983) ("Judges are not ferrets!").

employees between March 31, 2008 and May 22, 2008, including two hired to work at Plus4's call center and one at Plus4's marketing department, a Bank Secrecy Act officer, a collections manager, a collections representative, an indirect lending underwriter, and a trainer.  (Docket Entry No. 100, Ex. 4, Thompson Depo., 265, 267); (Docket Entry No. 83, Ex. B, Stark Depo., 52–53).  Udoewa also points to evidence that in May 2008, Stark sought "golden handcuff" retirement benefits for Collins, Havel, and Udoewa, (Docket Entry No. 99, Ex. 27, Golden Handcuff Email), and evidence that in 2004 Plus4 had built a new $5 million building.  (Docket Entry 100, Ex. 3, Moore Depo., 215).  Finally, Udoewa argues that Plus4 could have achieved significant savings by reducing travel expenses, although Stark testified that such expenses were set by the board, not by himself.  (Docket Entry No. 83, Ex. B, Stark Depo., 73).  In response, the defendants point to the undisputed evidence of financial problems facing the company; that the building purchase was negotiated before the extent of the financial problems became evident; that even with the hiring of some new employees, the size of the work force shrunk; that Udoewa's position was eliminated and no one was hired to replace him; and that the reduction in force that included eleven other employees, only one of whom is also identified as African or black.

Udoewa contacted board chair Ceaser Moore after learning of the reduction in force and his job elimination.  Moore testified that he had not been previously informed of Stark's decision to include Udoewa in the reduction in force.  Because of this, and because several other board members expressed concerns about the layoffs, Moore instructed Stark to reassign Udoewa to a North Houston location until the board could review these decisions.[18]  (*Id.*, Ex. C, Moore Depo., 103).

---

[18]  Udoewa argues that contrary to Moore's testimony, the board approved a layoff plan on August 19. Moore did not testify that the board approved a layoff plan on August 19.  Moore only testified that he did not recall the date the board approved the layoff plan, but that management had created the plan on August 19.  (Docket Entry No. 100, Ex. 3, Moore Depo., 124).

Udoewa reported to work at the North Houston location on August 25, 2008. (*Id.*, Ex. B, Stark Depo., 68–69). In his affidavit, Udoewa stated that at the North Houston location, there was little work for him to do. He greeted customers and did such tasks as shredding paper. Udoewa asserts that this made him "humiliated, mocked, and reduced to less than a human being." (Docket Entry No. 99, Ex. 37, Udoewa Aff., ¶ 3). At the same time, Udoewa argues that instead of firing him, Plus4 should have continued to employ him at the North Houston location. (Docket Entry No. 98, at 9).

The following morning, on August 26, Udoewa told Stark that he would not report back to the North Houston location. (Docket Entry No. 83, Ex. B, Stark Depo., 68–69). On September 4, Moore sent a memorandum to Stark informing him that the board of directors had approved the decision to eliminate Udoewa's position at an August 28 board meeting. (Docket Entry No. 99, Ex. 12, Moore Memo). Udoewa points out that the minutes from the August 28 board meeting do not indicate that he or any of the terminated employees were discussed. (*Id.*, Ex. 10, Aug. 28 Board Minutes). The defendants point to the Moore memo as evidence of the board's decision.

The record shows that after Udoewa's termination, Plus4 no longer had the position of vice-president of accounting. Collins testified that she, Stark, Claudia Cruz, and a senior accounting manager shared the duties that Udoewa had performed. (Docket Entry No. 100, Ex. 2, Collins Depo., 74–75). Udoewa argues that Collins took over his position after his termination. But the undisputed evidence in the record is to the contrary. Udoewa has not identified or produced any summary judgment evidence showing that Collins became the vice-president of accounting or took over all, as opposed to some, of the duties Udoewa had performed in that position.

Udoewa asserts that the evidence shows that the reduction in force was a pretext because Plus4 hired some individuals after the layoff. The record shows that Plus4 hired Eliot St. John as

18

a senior accounting manager in May 2009.  But the evidence is that this did not occur until Stark

decided that Cruz needed help with her accounting department duties.  (Docket Entry No. 109, Ex.

X, Stark Depo., 98).  Collins testified that Plus4 hired some individuals to replace employees who

left after the reduction in force occurred.  Overall, the undisputed evidence shows that Plus4's

workforce was reduced from 68 to 48 employees after the August 2008 layoffs.  (*Id.*, Ex. Y, Collins

Depo., 130–31).

On October 15, 2008, Udoewa filed this lawsuit against Plus4, Stark, and Collins.  (Docket

Entry No. 1).  In his amended complaint, Udoewa alleges that the defendants discriminated against

him in violation of 42 U.S.C. § 1981 by: (1) failing to promote him to the position of executive vice-

president and instead promoting Collins, a Caucasian female; (2) removing his title of vice-president

of human resources and transferring his supervision over that department to Collins; (3) firing him;

(4) maintaining a work environment hostile to black people and people from Nigeria; and (5)

retaliating against him for refusing to aid Plus4's investigation into the discrimination claim filed

by Thompson.  Udoewa further alleges that Plus4 negligently hired and retained Stark, who Udoewa

alleges defamed him by accusing him of sexual harassment.

The defendants have moved for summary judgment on all Udoewa's claims.  The arguments

as to each claim are analyzed below.

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**B.      Section 1981**

Udoewa alleges race and national origin discrimination under 42 U.S.C. § 1981.[19]  The standards under § 1981 are the same as under Title VII.  *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1233-34 (5th Cir. 1989).  Intentional discrimination can be proven by either direct or circumstantial evidence.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  Evidence is "direct" if it would prove the fact in question without inference or presumption.  *Jones v. Robinson Property Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citations omitted).

When a plaintiff attempts to prove allegations of discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).  Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination.  *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312.  A plaintiff satisfies this burden by showing that: (1) he is a member of a protected group; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated differently from those outside the protected class.  *See Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) ("To establish a prima facie case of discrimination under § 1981, Appellants must establish that they: (1) are members of a protected group; (2) were qualified for the position held; (3) were

---

[19]  The Fifth Circuit has held that "[t]he line between national origin discrimination and racial discrimination is an extremely difficult one to trace.  An attempt to make such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate."  *Bullard v. OMI Georgia, Inc.*, 640 F.2d 632, 634–35 (5th Cir. 1981).  "[R]ace and national origin discrimination may present identical factual issues when a victim is 'born in a nation whose primary stock is one's own ethnic group.'"  *Sinai v. New England Tel. and Tel. Co.*, 3 F.3d 471, 475 (1st Cir. 1993) (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)).

discharged from the position; and (4) were replaced by persons outside of the protected group."). If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must then identify or offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach). The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 (5th Cir. 2005). "'A prima facie case and sufficient evidence to reject the employer's explanation' may permit a trier of fact to determine that an employer unlawfully discriminated, and may therefore be enough to prevent summary judgment." *Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001) (quoting *Reeves*, 530 U.S. at 148). But "such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet 'no rational factfinder could conclude that the action was discriminatory.'" *Price*, 283 F.3d at 720 (quoting *Reeves*, 530 U.S. at 148–49). "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered

22

reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct." *Reeves*, 530 U.S. at 147 (internal quotations and citations omitted).

### C.    Hostile Work Environment

Udoewa alleges that the defendants maintained a hostile work environment in violation of § 1981.  Udoewa does not allege a claim under Title VII.   The same standard applies for hostile work environment under both Title VII and § 1981. *Williams-Boldware v. Denton Cnty.*, No. 4:09-CV-591, 2010 WL 2991164, at *8 (E.D. Tex. June 15, 2010) (citing *Felton v. Polles*, 315 F.3d 470, 483–84 (5th Cir. 2002)).  The elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action.  *Felton*, 315 F.3d at 484.  The fifth element is not required when the alleged harasser is a supervisor with immediate or successively higher authority over the plaintiff. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

The Supreme Court has explained that in determining whether workplace conditions are a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).  For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 F. App'x 457, 463–64 (5th Cir. 2008). "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Commc'ns LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)). The Supreme Court has made clear "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

### D.    Retaliation

Udoewa alleges retaliation under § 1981. The same standard applies for retaliation under both Title VII and § 1981. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). To make a *prima facie* showing of retaliation under § 1981, as under Title VII, a plaintiff must show that: "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis*, 383 F.3d at 319. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* "[I]n retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated." *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th

Cir. 2004); *see also Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005). "While this portion of the analysis may seem identical to the 'causal link' step in the prima facie case, the burden here is more stringent." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 685 (5th Cir. 2001). "The plaintiff must reveal "a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." *Id.*

### E.     The State-Law Claims

Udoewa alleges that Plus4 negligently hired and retained Stark, who defamed him. "To prevail on a claim for negligent hiring or supervision, the plaintiff is required to establish not only that the employer was negligent in hiring or supervising the employee, but also that the employee committed an actionable tort against the plaintiff." *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 384 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex. App.—San Antonio 1999, no pet.), *abrogated on other grounds by Hoffman–LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004)). Udoewa has alleged defamation as the underlying tort. The elements of defamation are that: (1) the defendant published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A defamatory statement is one in which the words tend to damage a person's reputation, exposing him or her to public hatred, contempt, ridicule, or financial injury. *Einhorn v. LaChance*, 823 S.W.2d 405, 410–11 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). "The truth of a statement is a defense to a claim for defamation." *Gustafson v. City of Austin*, 110 S.W.3d 652, 656 (Tex. App.—Austin 2003, pet. denied). This defense "does not require proof that the alleged defamatory statement is literally true in every detail; substantial truth is sufficient." *Id.*

### III.    Analysis

#### A.    The Discrimination Claims

##### 1.    The Argument That There is Direct Evidence of Discrimination

Udoewa alleges three adverse employment decisions: (1) the failure of Plus4 to promote him to executive vice-president in May 2008; (2) the removal of his human resources department duties on May 26, 2008; and (3) his job termination on August 22, 2008.  For each decision, Udoewa argues that two comments, one by Collins and one by Moore, provide direct evidence of discrimination.  The two comments are a statement by Collins in 2007 "that she wished the [United States] Department of Homeland Security would have refused [Udoewa] entry into the United States and keep [his] black ass in Black Africa," (Docket Entry No. 99, Ex. 37, Udoewa Aff., ¶ 12).  The second is a statement by Moore in 2007, allegedly repeated on June 12, 2008 that Udoewa was from the "bush part of Africa."  (*Id.*, ¶¶ 7, 13).

These statements are not the direct evidence of discrimination that Udoewa asserts.  They do not refer to any employment decision.  *See Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003), *overturned on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 328 (5th Cir. 2010) (noting that direct evidence includes "any statement or document which shows *on its face* that an improper criterion served as a basis, not necessarily a sole basis, for an adverse employment action") (emphasis added).  These statements require the factfinder to infer a relationship between the statement and the alleged adverse employment decisions and do not provide direct evidence of discrimination.  *Jones*, 427 F.3d at 992.  Because there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies.  411 U.S. at 802.

##### 2.    The Failure to Promote Claim

Udoewa asserts that on September 4, 2007, he asked Stark to promote him to the position of executive vice-president and that Stark responded by stating that Udoewa would be promoted as soon as Claudia Cruz, an accounting manager, received her B.A. Udoewa argues that though he helped Cruz enroll in the necessary courses, Stark promoted Collins, a Caucasian female, to the position in May 2008. (Docket Entry No. 99, Ex. 37, Udoewa Aff., ¶ 32).

In their motion for summary judgment, the defendants argue that Udoewa has not made a *prima facie* showing of discrimination under § 1981 because there is no evidence that Udoewa applied for the position of executive vice-president. Alternatively, the defendants argue that Udoewa has failed to create a fact issue as to whether the proffered reasons for promoting Collins—her longer tenure with Plus4, her greater experience with credit unions, her greater experience in operations, her greater experience interacting with Plus4's board of directors, and her ability to perform under pressure—is pretextual.

To make a *prima facie* showing of a discriminatory failure to promote, a plaintiff must show that "(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position." *Burrell*, 482 F.3d at 412 (citing *Medina*, 238 F.3d at 680–81). The defendants assert that there is no evidence that Udoewa applied for the position of executive vice president in September 2007. Udoewa responds by pointing to testimony that he requested the

27

promotion in September 2007, but Stark promoted a Caucasian female.[20]   The record warrants an assumption—as opposed to a finding—that a *prima facie* showing has been made.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves*, 530 U.S. at 148.  "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000) (citing *Reeves,* 530 U.S. at 147).  "The ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable fact finder could infer discrimination."  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000) (citing *Reeves,* 530 U.S. at 142).  "In making this determination, a court should consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case. . . .'"  *Id.* (citing *Reeves,* 530 U.S. at 148–49).  Courts are not to substitute their judgment for that of the employer in evaluating employment decisions.  *See, e.g.*, *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 (5th Cir. 1993) (ADEA claim).  Title VII is "not [a] vehicle[ ] to question or evaluate personnel moves, which although legal, may have been the result of poor business

---

[20]   The defendants point out that in his deposition, Udoewa testified that he discussed with Stark the possibility of becoming chief executive officer when Stark retired, and in his affidavit, he testified that he discussed with Stark a promotion to the position of executive vice-president.  A district court has discretion at the summary judgment stage to disregard affidavits "that are inconsistent with prior deposition testimony when the affiant does not account for the inconsistency."  *Tremont LLC v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 760 n.17 (S.D. Tex. 2010).  In this case, the record does not justify disregarding Udoewa's affidavit because it is not so inconsistent with his earlier deposition testimony.  Udoewa's inquiry about the position of chief executive officer does not foreclose the possibility that he also inquired about executive vice-president.

judgment." *Deaver v. Texas Commerce Bank N.A.*, 886 F. Supp. 578, 585 (E.D. Tex. 1995), *aff'd* 79 F.3d 1143 (5th Cir. 1996) (citing *Bodenheimer*, 5 F.3d at 959).

The defendants articulated a legitimate nondiscriminatory reason for promoting Collins to the executive vice-president position over Udoewa.  In his deposition, Stark testified that he decided to promote Collins because she had worked longer at Plus4, had more experience with credit unions, had more experience in operations, had more experience working with the board, and worked better under pressure.  (Docket Entry No. 83, Ex. B, Stark Depo., 102–03).  Because the defendants have met their burden, the presumption of discrimination dissolves.  *Reeves*, 530 U.S. at 142–43.  The burden shifts back to Udoewa to "offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"  *Rachid*, 376 F.3d at 312 (internal quotation marks omitted).

Udoewa does not make a mixed-motive argument. (Docket Entry No. 98, at 20).  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007) ("[The plaintiff] did not properly raise her mixed-motive argument below until her motion for new trial . . . .  Because a motion for a new trial cannot be used to argue a case under a new legal theory, the district court was correct in finding that [the plaintiff's] mixed-motive claim was waived."); *Ward v. Midwestern State Univ.*, 217 F. App'x 325, 329 (5th Cir. 2007) (stating that the plaintiff's failure to present any argument related to a mixed-motive alternative at the district court waived any avenue for appeal on that issue).  Instead, Udoewa responds that the proffered reason for promoting Collins instead of him is pretextual because he was better qualified than Collins.  He asserts that, unlike Collins, he had an M.B.A., and he had exemplary employee-evaluation reports while Collins had problems in her

position of vice-president of collections.   Udoewa also points to the allegedly discriminatory comments made by Collins and Moore.

A plaintiff may create a fact issue by providing or identifying evidence that he was "clearly better qualified" than the employee chosen for the position, not merely "similarly qualified." *Sabzevari v. Reliable Life Ins. Co*., 264 F. App'x 392, 395 (5th Cir. 2008); *see also Celestine*, 266 F.3d at 356–57; *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003).  "However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"   *Celestine*, 266 F.3d at 357 (quoting *Deines v. Tex. Dept. of Prot. & Regulatory Servs*., 164 F.3d 277, 280–81 (5th Cir. 1999)).   Evidence that a plaintiff was "clearly better qualified" than the employee chosen for the position "must be more than merely subjective and speculative."   *Eberle v. Gonzales,* 240 F. App'x 622, 630 (5th Cir. 2007) (quoting *Nichols v. Loral Vought Sys. Corp*., 81 F.3d 38, 42 (5th Cir. 1996)).   The Supreme Court has recognized that evidence of a plaintiff's superior qualifications may establish pretext "in some circumstances."   *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456–57 (2006) (per curiam).   The Court noted that several circuits find an inference of pretext only if "the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face."   *Id*.   The Court rejected this standard but declined to "define more precisely what standard should govern pretext claims based on superior qualifications."   *Id*. at 458.   The "clearly better qualified" standard set forth by the Fifth Circuit is not similar to the standard the Court found faulty in *Ash*.   *See, e.g.*, *Celestine*, 266 F.3d at 357; *Manning,* 332 F.3d at 882; *see also Bright v. GB Bioscience, Inc*., 305 F. App'x 197, 205 n. 8 (5th Cir. 2008) (recognizing that although *Ash* disapproved of the "jumping off the page" standard

as "unhelpful and imprecise," the Fifth Circuit's more precise definition of the comparative qualifications standard set forth in *Deines* is good law); *Burrell*, 482 F.3d 408, 412 (5th Cir. 2007) (recognizing, post-*Ash*, that a plaintiff may prove pretext by showing that he was "clearly better qualified" than the person selected for the position); *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 F. App'x 307, 313–14 (5th Cir. 2008) ("We are confident that [our "clearly better qualified"] standard comports with the directive in *Ash* to formulate a better standard [than "slap in the face"] to govern pretext claims based on superior qualifications."); *Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 383 (5th Cir. 2007) (applying the "clearly better qualified" standard, post-*Ash* ).  No inference of pretext or discriminatory motive arises if the differences in qualifications are not "so widely disparate that no reasonable employer would have made the same decision."  *Deines*, 164 F.3d at 282; *see also Odom v. Frank,* 3 F.3d 839, 846 (5th Cir. 1993) (a showing that two candidates are similarly qualified does not show pretext under this standard).  A plaintiff's assertion or belief that he was better qualified than the person selected for the position is insufficient to create a fact issue on pretext.  *Washington v. Hemphill Indep. Sch. Dist.*, No. 9:08-CV-102, 2009 WL 749198, at *8 (E.D. Tex. Mar. 19, 2009) (citing *Celestine*, 266 F.3d at 357); *see also Escobar v. Univ. of N. Texas*, 562 F. Supp. 2d 804, 811 (E.D. Tex. 2007) (concluding that a professor's "subjective belief . . . in her affidavit that she was better qualified than the professors who were not terminated" was insufficient to defeat summary judgment); *Leach v. Baylor College of Medicine*, Civ. Act. No. H-07-0921, 2009 WL 385450, at *24 (S.D. Tex. Feb. 17, 2009) ("A professor's assertion or belief that he was better qualified than the person selected for the position is insufficient to create a fact issue on pretext.").

Udoewa has not identified or produced evidence of the qualifications for the position of executive vice-president that made his advanced degree an important advantage over Collins's

education and experience.  Stark's testimony that Collins was better qualified because she had worked longer at Plus4, had more experience with credit unions, had more experience in operations, and had more experience working with the board provides evidence that the qualifications for the position of executive vice president were more closely related to specific experience, and about knowledge of Plus4, than to a graduate degree.  *See Manning*, 332 F.3d at 882 (finding that the plaintiff's educational background, various technical and analytical skills, and good performance during the interview process do not suggest that he was "*clearly better qualified* than the selected applicants" (emphasis in original)); *Moore v. Solar Grp.*, 311 F. App'x 722, 724 (5th Cir. 2009) ("Although Moore argues that Solar Group's claimed motivation is a pretext for race-based discrimination, she has failed to offer any evidence to create a genuine issue of material fact that the employer's reason masks intentional discrimination."); *Pastor v. College Station Indep. Sch. Dist.*, 57 F. App'x 210, at *3 (5th Cir. 2003) ("[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason is false, and that discrimination was the real reason." (quoting *St. Mary's Ctr. v. Hicks*, 509 U.S. 502, 513 (1993)); *Prejean v. Radiology Assocs. of Sw. La.*, 342 F. App'x 946, 951 (5th Cir. 2009) ("'[I]t is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" (quoting *Reeves*, 530 U.S. at 147)).

Udoewa has failed to raise a fact issue as to pretext (or discriminatory motive) based on the comparison of his qualifications with Collins.  An employer may choose more experience over an advanced degree without raising an inference of pretext.  *See Bauman v. United Healthcare Servs.*, Civ. Act. No. H-08-2882, 2009 WL 5178022, at *5 (S.D. Tex. Dec. 30, 2009) (finding no inference of pretext when an employer hired an individual with greater experience over an individual with a master's degree); *Price*, 283 F.3d at 722–23 (finding no inference of pretext when an employer hired

an individual without a college degree but with 102 hours of educational credit and experience in the military over an individual with a college degree); *see also Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997) (finding that despite the fact the plaintiff had more schooling, the defendants permissibly elected to value experience over education); *Rumala v. N.Y.C. Transit Auth.*, No. 02CV3828SLTKAM, 2005 WL 2076596, at *14 (E.D.N.Y. Aug. 26, 2005) ("Thus, the law in this circuit permits employers to value experience over education when making hiring decisions so long as there is nothing to show that value judgment is pretextual.").   Collins had more extensive experience relevant to the executive vice-president position than did Udoewa, including more experience with credit unions, more experience in operations, and more experience working with the board.   The record shows Collins began working at Plus4 approximately eight years before Udoewa started and that she had worked at two credit unions before joining Plus4.   (Docket Entry No. 100, Ex. 2, Collins Depo., 27–29).   The evidence in the record shows that the problems Udoewa asserts Collins experienced in her work as head of the collections department are universal for credit unions.   (*Id.*, 119).   These problems do not raise an inference of pretext.

Udoewa also argues that the comments allegedly made by Collins in 2007 and by Moore in 2007 and 2008 raise a fact issue as to pretext.   The defendants dispute that the comments were made but argue that even assuming the truth of Udoewa's assertions, these comments are stray remarks that do not preclude summary judgment.   Since *Reeves v. Sanderson*, the Fifth Circuit has taken a cautious view of the "stray remarks" doctrine.   *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003).   Such remarks "are appropriately taken into account when analyzing the evidence . . . even where the comment is not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision."   *Id.*   The Fifth Circuit has continued to apply the so-called *CSC Logic* test,

33

taken from *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655–56 (5th Cir. 1996), after *Reeves*.  Under that test, in analyzing whether a remark is probative of discriminatory intent, a court examines whether the comment is related to the protected class of persons of which the plaintiff is a member, proximate in time to the termination, made by an individual with authority over the employment decision at issue, and related to the employment decision at issue.  *See Gillaspy*, 278 F. App'x at 313; *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255 (5th Cir. 2007).  But the Fifth Circuit cases are unclear as to whether this test only applies when comments are offered as evidence of direct discrimination as opposed to circumstantial evidence.  *Compare Jenkins*, 478 F.3d at 261–62 (applying four-factor test to evidence of pretext in evaluating a section 1981 claim); *with McLaughlin v. W & T Offshore, Inc.*, 78 F. App'x. 334, 338–39 (5th Cir. 2003) ("In order to prove pretext in this manner, the statement must: (1) demonstrate a discriminatory motivation, and (2) be made by a person 'primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decision maker.'"); *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) ("We continue to apply the *CSC Logic* test when a remark is presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework . . . .  [T]he *Russell* court did not apply the *CSC Logic* test to a remark introduced as additional evidence of discrimination."); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) (holding that workplace remarks sufficed as circumstantial evidence from which inference of discriminatory intent could be drawn even though comments were "stray remarks" under the *CSC Logic* test).

Under the more relaxed test used in *Russell* and *Laxton,* a plaintiff wishing to use workplace remarks as circumstantial evidence of employment discrimination need only show that the remarks demonstrate discriminatory animus on the part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant

decision maker. *Russell*, 235 F.3d at 225; *Laxton*, 333 F.3d at 583; *see also Phillips v. TXU Corp.*, 194 Fed. App'x 221, 228 (5th Cir. 2006) (holding that "[a] remark is considered probative of discrimination if it demonstrates discriminatory animus and was made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker."). But even under the more relaxed standard, the remark cannot be the only evidence of pretext. *Phillips*, 194 F. App'x at 228 (citing *Palasota*, 342 F.3d at 577 ("After *Reeves* . . . so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent.")).

In the present case, even assuming that the more relaxed test under *Laxton* applies, Udoewa cannot raise a fact issue as to pretext. The record shows no other evidence of pretext. In the absence of other evidence of pretext, the comment does not preclude summary judgment. *See Auguster v. Vermillion Parish Sch. Board,* 249 F.3d 400, 405–06 (5th Cir. 2001). The alleged isolated comment by Collins and the ambiguous comment by Moore standing alone, are insufficient to raise a fact issue as to whether the defendants' nondiscriminatory reasons for the failure to promote Udoewa are pretextual.

In addition, Udoewa has not pointed to or produced evidence that Collins or Moore were involved in, or had authority over, the decision to promote Collins to executive vice president over Udoewa or that at least Collins was in a position to influence that decision. While discriminatory remarks may be taken into account, "even where the comment is not in the direct context of the termination and even if it is uttered by on other than the decision maker," there must be evidence that "the individual is in a position to influence the decision." *Matthews v. United Broth. of Carpenters and Joiners of Am.*, 228 F. App'x 436, 441 (5th Cir. 2007) (citing *Palasota*, 342 F.3d

at 578).  There is no evidence that either Collins or Moore played any role in Stark's decision not to promote Udoewa.

Three other pieces of evidence are worth noting.  First, shortly after Collins was promoted, on May 23, 2008, Stark changed Udoewa's title to "chief financial officer/vp of accounting," adding the title of chief financial officer.  (Docket Entry No. 83, Ex. J, May 23, 2008 Stark email).  This adds to the conclusion that Udoewa has failed to demonstrate a fact issue as to whether the defendants' explanation for promoting Collins was pretextual.  Second, it is worth noting that the same actor, Stark, hired and promoted Udoewa before promoting Collins to executive vice-president, and later made Udoewa chief financial officer as well as vice-president of accounting.  The parties do not dispute that Stark hired Udoewa, promoted Udoewa to the position of accounting supervisor, and promoted Udoewa to the position of vice-president of accounting, making him part of Plus4's senior management team.  (Docket Entry No. 83, Ex. B, Stark Depo., 27–28).  "The same actor inference creates a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue." *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421–22 (5th Cir. 2009); *see also CSC Logic*, 82 F.3d at 658 (noting acceptance of the same actor inference by several other circuits and expressing approval of the inference); *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (stating that such evidence is relevant but declining to establish a rule that no inference of discrimination could arise under the same actor circumstances).  This inference is consistent with the conclusion that no fact issue as to pretext is present.  Third, Stark identified himself as black.  Courts have held that "[e]vidence that the person who made the final decision to terminate a particular plaintiff was the same race as the plaintiff undercuts any inference of discrimination." *Boice v. Se. Penn. Transp. Authority*, No. 05-4772, 2007 WL 2916188, at *10 (E.D. Pa. Oct. 5, 2007); *see also Rhodes v.*

*Runyon*, No. Civ. A. 494CV125DD, 1995 WL 1945558, at *5 (N.D. Miss. Nov. 1, 1995) (finding

that plaintiff's "claim of race discrimination pushes the limits in that the person who terminated his

employment is of his same race"). An inference based on Stark's race is not deserving of significant

weight in this case, but it is consistent with the conclusion that no fact issue as to pretext is present.

Defendants' motion for summary judgment on Udoewa's claim that he was not promoted based on

race and national origin discrimination is granted.

### 3. The Claim Arising from the Removal of Udoewa's Supervision Over the Human Resources Department

Udoewa alleges that the defendants discriminated against him by transferring his

responsibilities to supervise the human resources department to Collins on May 20, 2008. In their

motion for summary judgment, the defendants argue that Udoewa has failed to make a *prima facie*

showing that this was actionable discrimination because this transfer was not an "adverse

employment action." *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) ("[A]n

adverse employment action consists of ultimate employment decisions such as hiring, granting

leave, discharging, promoting, and compensating" (citations and quotations omitted)). The

defendants emphasize that three days before the transfer, Udoewa received the additional title and

responsibilities of chief financial officer. After the transfer, Udoewa had these duties as well as the

important responsibilities related to his positions as vice president of accounting and his membership

on the senior-management committee. Udoewa responds that the loss of the title of vice-president

of human resources—which the defendants dispute he had—and the responsibilities are adverse

employment decisions. Alternatively, the defendants argue that they have provided a legitimate

nondiscriminatory reason for transferring the human resources department supervision to Collins.

The defendants explain that they transferred those duties because of the concerns related to

37

Udoewa's supervision of Thompson as manager of that department and concerns that Udoewa was overburdened. Udoewa argues that the defendants' explanation for the transfer of Collins is pretextual because he had adequately trained Thompson and her performance would have improved over time, and there was no reason to believe that Collins could provide better supervision.

As a matter of law, the transfer of Udoewa's responsibilities to Collins was not an adverse employment decision. *See Pryor v. Wolfe*, 196 F. App'x. 260, 262–63 (5th Cir. 2006) (holding that the "materially adverse" standard from *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), only applies to Title VII retaliation claims and an adverse employment decision remains an element of a Title VII discrimination claim). Only "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensation" are actionable "adverse employment actions" for purposes of Title VII discrimination claims. *Id.* "Circuit precedent establishes that in cases where the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action." *Pegram*, 361 F.3d at 283 (citing *Serna v. City of San Antonio*, 244 F.3d 479, 485 (5th Cir. 2001)). An adverse employment action has been defined as:

> a materially adverse change in the terms and conditions of employment [that] must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation.

*Holmes v. DEA*, 512 F. Supp. 2d 826, 840 (W.D. Tex. 2007) (citing *Crady v. Liberty Natl. Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

38

The undisputed evidence shows that a few days before the transfer, Udoewa received the added title and duties of chief financial officer.  After the transfer, Udoewa had this new title and retained his title and duties of vice-president of accounting and his position on the senior management committee.  Even assuming that Udoewa lost the title of vice-president of human resources—which is disputed—he instead acquired a title at least as prestigious and important, that of chief financial officer.  The transfer of the responsibility to supervise the head of the human resources  department did not reduce his salary or benefits.  And there is no evidence that the transfer of this responsibility significantly diminished Udoewa's material job responsibilities.  He continued to have responsibility for the payroll as part of his duties as vice-president of accounting.  (Docket Entry No. 83, Ex. F, Stark Aff., ¶ 3). At most the record contains evidence that Udoewa lost two duties relating to human resources responsibilities: (1) routinely making recommendations about employees to Stark; and (2) overseeing the director of the human resources department. (Docket Entry No. 83, Ex. B, Stark Depo., 36–37); (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 136–37).  The evidence does not raise a fact issue as to whether, given the addition of a new title a few days before the transfer of the human resources department title and duty to supervise the head of that department, the loss of that title and responsibility diminished the material aspects of Udoewa's employment at Plus4 as to be an ultimate employment decision.  *See, e.g.*, *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000), *abrogated on other grounds by Burlington Northern*, 548 U.S. 53 (noting that the removal of a major sales account would not constitute an adverse employment action).  Because Udoewa has not demonstrated an issue of fact as to whether there was a significant reduction in his material responsibilities, the defendants are entitled to summary judgment on this claim.

39

Udoewa's claim also fails for the same reason his failure-to-promote claim fails.  Assuming that Udoewa has made a *prima facie* showing of discrimination in the transfer of the human resources department title and duty, it is a weak showing.  The only evidence of discrimination is that Udoewa's responsibilities were transferred to a Caucasian, Collins, and the alleged discriminatory statements by Moore and Collins.  The transfer of responsibilities to Collins supports only a weak inference of discrimination.  *Bright*, 305 F. App'x at 203.  And Udoewa has not produced any evidence that either Moore's or Collins's statements related to the transfer of his responsibilities or that either individual had or exercised authority or influence over Stark's decision to transfer Udoewa's responsibilities.  *Matthews*, 228 F. App'x at 441.  The defendants have articulated a legitimate nondiscriminatory reason for transferring Udoewa's human resources to Collins.  The defendants have produced evidence that while Udoewa oversaw her work as head of the human resources department, Thompson made over twenty significant payroll errors between April 4, 2008 and May 30, 2008 and had other work performance problems as well.  (Docket Entry No. 83, Ex. I, Thompson Payroll Corrections).  The defendants have also produced evidence that Stark was very concerned about the problems with Thompson's performance and about Udoewa's failure to bring any of those performance problems to Stark's attention.  (*Id.*, Ex. B, Stark Depo., 39–43).  The defendants argue that because of these concerns and concerns about overburdening Udoewa—particularly given his added role as chief financial officer—his human resources department supervisory responsibilities were transferred to Collins.

Again, Udoewa does not appear to raise or argue a mixed-motive theory of discrimination. (Docket Entry No. 98, at 20); *Turner*, 476 F.3d at 347; *Ward*, 217 F. App'x at 329.  He has failed to identify or produce evidence that creates a fact issue as to whether the defendants' nondiscriminatory reasons are merely a pretext for discrimination.  *Rachid*, 376 F.3d at 312; *see also*

*Moore*, 311 F. App'x at 724; *Pastor*, 57 F. App'x 210, at *3; *Prejean*, 342 F. App'x at 951.  Udoewa responds only that Thompson's employment was probationary during this period; Stark knew when she was hired on Udoewa's recommendation that she lacked human resources experience and expertise; and Udoewa was confident that she would improve over time.  Udoewa does not dispute the problems that Thompson had, the length of time they lasted, or that he had recently received the new title of chief financial officer as well as vice president of accounting.  At most, these facts challenge whether Stark made a prudent decision in transferring Udoewa's human resources responsibilities.  Courts, however, have long abstained from second-guessing the prudence of an employer's business-judgment decision when there is no evidence raising a fact issue of discrimination.  *See Deines*, 164 F.3d at 278 ("Whether an employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide.  The single issue for the trier of fact is whether the employer's [action] was motivated by discrimination."); *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 142 (5th Cir. 1996) ("The relevant inquiry in any case is not whether the employer's evaluations were wise or correct, but whether they were honestly held and free of discriminatory bias.").  The defendants are entitled to summary judgment on this claim.[21]

### 4.      The Wrongful Termination Claim

The defendants argue that Udoewa has failed to make a *prima facie* showing of discrimination because he has not presented evidence that he was replaced by someone outside the protected class or that other similarly situated persons were treated more favorably.  *Frank*, 347 F.3d at 137.  Alternatively, the defendants argue that Udoewa has failed to create a fact issue as to

---

[21]  The same-actor analysis and the fact that both Stark and Udoewa are black further support this court's finding that Udoewa has not raised a fact as to pretext for discrimination.

whether their proffered nondiscriminatory explanation for Stark's decision to terminate Udoewa's employment—that his position was eliminated and his duties divided among other employees as part of a reduction in force to reduce expenses—is a pretext for discrimination.  Udoewa responds that he has met his *prima facie* burden because he was the only member of the senior management committee subjected to the reduction in force and that he has raised a fact issue as to pretext by evidence that Plus4 had hired new employees three months before the reduction in force and had begun an unnecessary office construction project before the reduction in force, and could have reduced its expenses more effectively in other ways besides eliminating his position.

Assuming that Udoewa has made a *prima facie* showing of discrimination, it is weak.  The only evidence is (1) that Udoewa was the only member of the senior-management team laid off and (2) the discriminatory statements allegedly made by Moore and Collins.  The evidence shows that worsening financial problems facing Plus4 led to the reduction in force.  The evidence shows that Stark used six factors to determine which employees would be included in the layoff: "(1) positions that could easily be absorbed within their respective departments; (2) positions that could be outsourced at a lesser cost to the organization; (3) positions that provide services with continued losses; (4) individuals that have not performed over and beyond what was expected; (5) tellers and financial representatives with less than one year of experience; and (6) that there were no other positions available to utilize these employees' skill sets."  (Document Entry No. 83, Ex. F., Stark Aff., ¶ 9).  Udoewa has neither argued nor identified or produced evidence that any other members of the senior management team should have been laid off under these factors.  There is no evidence, for example, that the responsibilities of other senior management team members could be absorbed by other departments in the company.

42

Udoewa characterizes the fact that 100% of the black individuals on Plus4's senior management team, that is, that Udoewa was laid off as "statistical evidence."  Statistical evidence may be used in a Title VII case as part of a *prima facie* case or a pretext showing.  *See E.E.O.C. v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1185 (5th Cir. 1996) ("statistical evidence may be probative of pretext in limited circumstances"); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1285 (5th Cir. 1994) ("The plaintiffs may establish a prima facie case of disparate treatment by the use of statistics . . . ." (internal citations omitted)).  But "[s]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances."  *Anderson*, 26 F.3d at 1285 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)).  Recharacterizing the evidence as statistical does not create an inference of discrimination or respond to the defendants' stated reason for firing Udoewa.

As to the alleged comments made by Collins and Moore, Udoewa has not identified or produced any record evidence that they related to the reduction in force.  Udoewa has presented evidence that Moore was in a position to influence the decision to include Udoewa in the reduction in force.  But Udoewa also provided evidence that Moore learned that Udoewa had been included in the reduction in force after Stark had made the decision  and learned of it from Udoewa himself.  The evidence also shows that Moore asked the board to reconsider including Udoewa in the reduction in force.  The entire board later ratified Stark's decision to reduce the work force and include Udoewa among the employees subject to the reduction.  But the evidence is undisputed that the decision to do so was made by Stark, not Collins or Moore.  The evidence shows only that Collins informed Udoewa of his termination, and that Collins selected individuals under her supervision who would be subject to the layoff.  Any inference of discrimination is weak.

43

The defendants articulated a legitimate nondiscriminatory reason for laying off Udoewa. A reduction in force can be a legitimate, nondiscriminatory reason for discharge. *Taylor v. Albermarle Corp.*, 286 F. App'x 134, 135 (5th Cir. 2008) (citing *Tex. Instruments*, 100 F.3d at 1181). The defendants have also submitted evidence supporting their justification for reducing Plus4's force. Stark testified that in 2009, Plus4 projected a $3 million net loss for 2008. (Document Entry No. 83, Ex. F., Stark Aff., ¶ 7). Moore testified that the NCUA informed Plus4 that it was overstaffed. (*Id.*, Ex. C, Moore Depo., 68–69). The defendants asserted, and Udoewa acknowledged, that the NCUA pressured Plus4 to cut costs. (Docket Entry No. 98, at 1). By August 2008, Plus4 had begun to discuss how best to minimize costs. Collins, Havel, and Udoewa had two meetings to discuss cost-saving strategies. (Document Entry No. 83, Ex. F., Stark Aff., ¶ 8). At the August 13, 2008 meeting, Udoewa suggested a 25 percent across-the-board salary reduction to reduce costs. (*Id.*); (Docket Entry No. 83, Ex. S, Udoewa Memo). Stark hired Ratzman as a consultant to help in Plus4's cost-reduction efforts. In his report, Ratzman recommended that Plus4 reduce a number of expenses, including expenses related to director travel, fees pad to directors for attending meetings, employee travel, participation in the Credit Union Coalition, operations, marketing, loan servicing, and professional fees. (Docket Entry No. 83, Ex. F., Stark Aff., ¶ 8); (Docket Entry No. 84, Ex. U, Ratzman Report). Stark decided that the best way to reduce Plus4's expenses was by laying off selected employees, rejecting the suggestion of an across-the-board salary reduction because of the overstaffing and because such cuts would severely impact employee morale. (Document Entry No. 83, Ex. F., Stark Aff., ¶ 8).

The defendants have also submitted evidence supporting their position that Udoewa was terminated under the six factors Stark established for selecting individuals who would be subject to the reduction in force. Stark, Collins, and Havel applied the factors to select employees under their

supervision who would be subject to the layoff.  The evidence shows that Stark, as Udoewa's supervisor, made the decision to include him in the reduction in force because his job duties could be absorbed by other departments and employees and because he had a relatively high salary.  The record shows that after Udoewa left the company, he was not replaced.  Instead, Stark, Collins, a senior accounting manager, and Cruz took over Udoewa's responsibilities.  The record contains no evidence that any individual was given the title vice president of accounting or chief financial officer.  Because the defendants have met their burden, the presumption of discrimination dissolves. *Reeves*, 530 U.S. at 142–43.

Udoewa points to evidence that: (1) between March 31, 2008 and May 22, 2008, Plus4 hired seven individuals; (2) in 2004, Plus4 had built a $5 million building; (3) in May 2008, Stark sought a "golden handcuff" benefit package; and (4) Plus4 could have reduced salaries across the board or reduced other expenses, such as travel, instead of laying him off.  None of this evidence raises a fact issue as to whether the decision to have a reduction in force that terminated the jobs of 12 employees, and to include Udoewa among them, was a pretext for discrimination.  Udoewa has not raised a fact issue as to whether he met the criteria for inclusion in the reduction in force.  *See Lowery v. Allstate Tex. Lloyds, Inc.*, Civil Act. No. 3:06-CV-1886-L,  2007 WL 4208476, at *8 (N.D. Tex. Nov. 29, 2007) (finding that the employer was entitled to summary judgment because the employee could not refute the reduction-in-force criteria used to select the employee for termination).  Nor has Udoewa raised a fact issue as to whether Plus4 faced financial problems, had to reduce expenses, and that Stark concluded that it should do so by eliminating the positions of employees whose duties could be absorbed by other departments.

Udoewa also challenges Plus4's decision to lay employees off rather than reduce other operating expenses or cutting salaries across the board.  When faced with similar arguments, courts

defer to the business judgment of the employer unless there is strong evidence of discrimination. *See Bell v. Bank of Am.*, 171 F. App'x 442, 445 (5th Cir. 2006) (refusing to question an employer's decision to restructure without evidence that the restructuring was motivated by racial discrimination); *Davenport v. Northrop Grumman Sys. Corp.*, 281 F. App'x 585, 588 (7th Cir. 2008) (refusing to question employer's claim that employee was terminated because her position could be absorbed by other employees because "[i]t is not our task to review the soundness of [the employer's] reasoning" and noting that "courts are not . . . to act as a super-personnel department"). That Stark could have reduced some costs without laying off employees does not demonstrate that the defendants' explanation for having a reduction in force to address financial problems and including Udoewa among the 12 employees laid off are pretextual.[22]   The defendants are entitled to summary judgment as a matter of law.

### 5.      The Hostile Work Environment Claim

Udoewa alleges a racially hostile work environment.  As evidence, Udoewa points to: (1) Plus4's counsel pressuring him to provide information for the investigation into Thompson's discrimination charge; (2) Stark allegedly accusing Udoewa of sexual harassment against Perales; (3) Stark dispatching Udoewa to perform menial jobs at the North Houston location after he was told he would be subject to the reduction in force but during the board's reconsideration of this decision; and (4) the discriminatory comments allegedly made by Collins and Moore.  (Docket Entry No. 98, at 31–32).  The defendants argue that Udoewa has not identified or produced evidence raising a triable issue of fact as to whether this conduct was sufficiently severe to affect a term, condition, or privilege of employment.  (Docket Entry No. 83, at 31–34).  The defendants also argue that, with

---

[22]  The same-actor analysis and the fact that both Stark and Udoewa are black further support this court's finding that Udoewa has not raised a fact as to pretext for discrimination.

46

the exception of Thompson's and Moore's comments, Udoewa has not presented evidence that any of the alleged incidences of harassment were based on race.  (*Id.* at 35–36).

The evidence, taken in the light most favorable to Udoewa, does not raise a fact issue as to a hostile work environment.  Title VII "was only meant to bar conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir.1996); *see also Shepard*, 168 F.3d at 874.  It is a "demanding" standard that requires proof of severe or pervasive conduct that can be characterized as "extreme."  *Faragher,* 524 U.S. at 788.

Udoewa has not presented any evidence, or even argued, that Plus4's counsel asking him to provide information for the investigation of Thompson's allegations, Stark relaying Perales's accusation of "sexual harassment," and Stark dispatching of Udoewa to perform menial jobs at the North Houston location, amount to a hostile work environment.  The evidence shows that after Thompson filed a discrimination complaint against Plus4, its outside lawyers were asked to investigate.  They interviewed Udoewa after Thompson stated that she had complained about the work place at Plus4 to Udoewa during her employment there.  There is no basis to find that the outside lawyers' request that Udoewa relate what she had told him was a hostile work environment. Udoewa acknowledged that the lawyers did not pressure him to provide false information.  (Docket Entry No. 100, Ex. 1A, Udoewa Dep. II, 83–84).  Nor is there evidence that the interviews of Udoewa and requests for his cooperation were based on animus towards his race.  *See Felton*, 315 F.3d 470 at 484; *see also Vallecillo v. U.S. Dep't of Housing and Urban Dev.*, 155 F. App'x 764, 767 (5th Cir. 2005) (affirming summary judgment on a hostile work environment claim when the complained-of harassment was not based on the plaintiff's race or national origin); *Cooper v. Wal-*

47

*Mart Transp., LLC*, Civ. Act. No. H-08-0085, 2010 WL 2522625, at *8 (S.D. Tex. Jun. 18, 2010) (finding that the defendant was entitled to summary judgment where there was no evidence demonstrating that much of the alleged conduct was based on the plaintiff's race).

Similarly, the evidence as to Stark's handling of Perales's statements that Udoewa had behaved with inappropriate favoritism toward her, in front of other employees, does not raise a fact issue as to a hostile work environment.  Taking the disputes between Udoewa's and Stark's accounts in the light most favorable to Udoewa does not raise a fact issue.  It is undisputed that after a very brief investigation, Perales made it clear that she was not making any sexual harassment charge. Stark made that clear as well.  The evidence shows that nonetheless, Udoewa insisted that he had been wrongly accused of sexual harassment and demanded a full board investigation.  There is no evidence that this was handled in a way that contributed to cause a hostile work environment.

The evidence as to the single day that Udoewa spent at North Houston does not raise a fact issue as to a hostile work environment.  The evidence shows that Udoewa was asked to go to North Houston on very short notice when the board decided to reconsider whether to include him in the reduction in force.  During that day, he had very little to do.  The only tasks available were far below his usual work.  There is no evidence that other than this single day, Udoewa was asked to do work that was "menial."

Finally, Udoewa argues that the allegedly discriminatory remarks made by Collins in 2007 and by Moore in 2007 and 2008 raise a fact issue on a hostile work environment.  The case law on when workplace comments give rise to a hostile work environment claim shows a far greater degree of harassment than the record discloses here, both in terms of the frequency and the nature of the offensive communications.  *Compare Walker v. Thompson,* 214 F.3d 615, 619–22 (5th Cir. 2000) (holding that the plaintiff could survive summary judgment based on evidence of years of

48

inflammatory racial epithets, including "nigger" and "little black monkey"); *with Baker v. FedEx Ground Package Sys., Inc.*, 278 F. App'x 322, 329 (5th Cir. 2008) (a supervisor's comments to an African-American employee that "she did not want to work with people like" employee and that "whites rule" were not sufficiently severe to establish a race-based hostile work environment); *Turner*, 476 F.3d at 348 (holding that a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive harassment); *Septimus*, 399 F.3d at 612 (holding that one two-hour "harangue" by a supervisor and his use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend" did not amount to a severe or pervasive working environment); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (occasional racial comments were insufficient for a hostile work environment claim). Taking as true Udoewa's assertion that these comments were made, his claim still fails because the isolated and infrequent comments he has alleged do not create a triable issue of fact as to whether the harassment affected a term, condition, or privilege of his employment.

### 6.    The Retaliation Claim

Udoewa argues that the defendants retaliated against him for his refusal to cooperate with Plus4's outside counsels' investigation into Thompson's allegations of racial discrimination after her discharge. In support, he points to statements by Plus4's attorneys that his refusal to cooperate with the investigation would be "bad for his career." (Docket Entry No. 100, Ex. 1A, Udoewa Depo. II, 81). The defendants argue that Udoewa has failed to make a *prima facie* showing of retaliation because his refusal to cooperate with the defendants during their investigation was not a protected activity. Alternatively, the defendants argue that Udoewa has not raised a fact issue as to whether

the defendants' explanation that Udoewa was fired under Plus4's layoff plan was a pretext for retaliation.

In retaliation cases in which the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated.  *Pineda*, 360 F.3d at 487.  Udoewa's retaliation claim fails because he has failed to demonstrate a fact issue as to whether he was terminated because he fit the criteria for the elimination of his position under the reduction in force.  *See Septimus*, 399 F.3d at 608; *see also Baker v. Am. Airlines,* Inc., 430 F.3d 750, 755 (5th Cir. 2005) (finding that an employee's age discrimination and retaliation claim both failed because the employee did not raise a fact issue as to whether the employer's reduction in force was pretextual); *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009) (finding that the employee's retaliation claim failed because, like his discrimination claim, it failed to rebut the employer's stated reason for job termination); *Phillips*, 194 F. App'x at 228 (upholding summary judgment on retaliation claim because the employee failed to raise a fact issue with respect to the employer's reasons for applying the reduction in force to that employee).  For the reasons discussed above, the record does not raise a fact issue as to whether, given its need to reduce expenses, Plus4 decided to layoff employees rather than cut salaries and decided that Udoewa should be included among the 12 who were terminated because his responsibilities could be absorbed by other departments and because he was highly paid.  There is no evidentiary support for an inference that, but for Udoewa's refusal to provide information about the complaints Thompson had made to him about her work at Plus4, he

would not have been included in the reduction in force.[23]  The defendants are entitled to summary judgment on this claim.

### B.      The Defamation and Negligent Retention Claims

Udoewa alleges that Stark defamed him by accusing him of sexually harassing Plus4 employee Yolanda Perales.  Udoewa also alleges that Plus4 is liable for negligently retaining Stark. As noted in a previous order, Udoewa cannot sustain a cause of action for negligent retention without an underlying tort.  (Docket Entry No. 24, at 13); *see also Gonzales*, 995 S.W.2d at 739. And though this court granted Udoewa leave to amend his complaint, Udoewa's amended complaint only asserts one tort, the defamation claim against Stark.[24]  (Docket Entry No. 29, ¶¶ 19, 35).  The defendants argue that Udoewa has not raised a disputed fact issue as to two elements of his

---

[23]  The Fifth Circuit has not ruled as to whether an employee's refusal to assist an employer in defending a Title VII suit is a protected activity.  Circuit court decisions do not provide a clear answer.  The Sixth Circuit has held that refusal to participate is not a protected activity because the plain meaning of the ADEA's antiretaliation provisions, which mirror those of Title VII, only protect "actual" participation in an employment discrimination action. *Merkel v. Scovill, Inc.*, 787 F.2d 174, 180 (6th Cir. 1986); *see also Moss v. Lear Corp.*, 2007 WL 2901139 (N.D. Ind. Sept. 28, 2007) (discussing *Merkel*); *Harris v. Fulton–DeKalb Hosp. Auth.*, 255 F. Supp. 2d 1347, 1355–56 (N.D. Ga. 2002) (finding that an employee's "voluntary and insubordinate refusal to participate in a Title VII investigation of complaints of discrimination" is not a protected activity).  The Sixth Circuit recognizes two exceptions: (1) when an employer pressures an employee to lie and (2) when an employer pressures an employee to give statements or evidence the employer does not reasonably believe the employee possesses.  In contrast, the Third Circuit recognized that "an employee's refusal to cooperate with management's investigation of a claim filed by another employee may constitute protected activity under the anti-discrimination laws."  *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 n.2 (3d Cir. 2002).

[24]  The amended complaint also alleges that Stark "used the funds of Plus4 . . . to purchase jewelry for Beverly Hughston but was never disciplined or admonished for his conduct"; "was not disciplined . . . for employment discrimination action filed by former employee Jerilyn Wood"; "was not disciplined . . . for employment discrimination action filed by former employee Elizabeth Campbell"; "failed to monitor the loan delinquency ration of Patricia Collins and allowing loans to be hidden in 'Loan Suspense' and was not investigated or reprimanded"; and  "covered up Melissa Havel's use of corporate funds for personal gains, and was not investigated or reprimanded."  (Docket Entry No. 29, ¶ 35).  These are not torts and cannot sustain a negligent retention claim.

defamation claim: (1) whether the alleged defamatory statements were true or substantially true; and (2) whether Stark published the alleged defamatory statements.

The defendants are entitled to summary judgment on Udoewa's defamation claim because there is no evidence that Stark published an accusation of sexual harassment against Udoewa.  To the contrary, the evidence shows that Stark conducted an investigation into Perales's statements and swiftly concluded that none of Udoewa's alleged acts constituted sexual harassment.  (Docket Entry No. 83, Ex. B, Stark Depo., 140–42).  Stark told Udoewa, both in a meeting on June 9, 2008, and in a later email sent on June 11, 2008, that he was not accused of sexual harassment.  (*Id.*, Ex. L, June 11, 2008 Emails).  On June 10, 2008, Perales signed a memo stating, "I feel that the instances that were noted were not offensive to myself nor did I feel in any way harassed by Henry Udoewa." (*Id.*, Ex. G-1).  And on June 11, 2008, Stark, with Collins present, told Udoewa that Perales did not intend to pursue her statements about Udoewa.  The record shows that it was Udoewa who insisted on telling the board that Perales and Stark had accused him of sexual harassment and who demanded an investigation, which Plus4 provided.  And after interviewing "all of the relevant witnesses," Stark and Plus4 concluded that there was "no evidence . . . reflecting actionable sexual harassment by Mr. Udoewa."  (*Id.*, Ex. F, Stark Aff., ¶ 6).  Udoewa has not pointed to evidence that Stark published an accusation by Perales that Udoewa had sexually harassed her.  There is no triable issue of fact as to whether Stark committed the tort of defamation and no triable issue as to Udoewa's negligent retention claim.  The defendants are entitled to summary judgment on both claims.

## IV.    The Motion to Seal Records and for Sanctions

The defendants moved to seal records that Udoewa filed as attachments to his motion for summary judgment and for sanctions for his failure to file those documents under seal.  (Docket

Entry No. 107).  The documents had been designated as confidential under the protective order submitted by the parties and signed by this court.  (Docket Entry No. 27).

Under the terms of the protective order, the documents at issue should have been filed under seal, but that does not mean that they should have remained under seal.  Courts differentiate the standard for sealing documents filed with the court, which usually is more exacting than the showing required for a protective order under which information produced in discovery is designated as confidential by the producing party.  In analyzing requests to seal court documents, courts emphasize the presumption of public access to judicial records and often require compelling reasons in order to seal court documents.  This is a more stringent showing than the requirement for a showing of good cause to support the issuance of a protective order.  Compare *In re Terra Int'l Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (per curiam) (protective order for documents exchanged in discovery) *with § v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) (sealing documents filed with the court).  The Fifth Circuit has described the following standard for sealing court documents:

> Courts have recognized that the public has a common law right to inspect and copy judicial records.  *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S. Ct. 1306, 1312, 55 L. Ed. 2d 570 (1978); *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 429 (5th Cir. 1981).  However, the public's common law right is not absolute.  *Nixon*, 435 U.S. at 598, 98 S. Ct. at 1312; *see Belo*, 654 F.2d at 430.  "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."  *Nixon*, 435 U.S. at 598, 98 S. Ct. at 1312.  Thus, the common law merely establishes a presumption of public access to judicial records.  *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988).  Although the common law right of access to judicial records is not absolute, "the district court's discretion to seal the record of judicial proceedings is to be exercised charily."  *Federal Savings & Loan Ins. Corp. v. Blain*, 808 F.2d 395, 399 (5th Cir. 1987).
>
> In exercising its discretion to seal judicial records, the court must balance the public's common law right of access against the

> interests favoring nondisclosure. *See Nixon*, 435 U.S. at 599, 602, 98 S. Ct. at 1312, 1314 (court must consider "relevant facts and circumstances of the particular case"); *Belo*, 654 F.2d at 434; *see also Bank of America Nat'l Trust v. Hotel Rittenhouse*, 800 F.2d 339, 344 (3d Cir. 1986) (court had duty to "balance the factors favoring secrecy against the common law presumption of access"); *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983) ("The historic presumption of access to judicial records must be considered in the balance of competing interests." (citing *Belo*)).

§ *v. Van Waeyenberghe*, 990 F.2d at 848 (5th Cir. 1993) (footnote omitted). The *Van Waeyenberghe* court found that the district court had abused its discretion in sealing court documents because there was no evidence that the district court balanced the competing interests prior to entering the sealing order, noting that the district court had not mentioned the presumption in favor of public access to judicial records and had not articulated any reasons that would support sealing the documents at issue. *See id.* at 848–49. The Fifth Circuit has explained that the right of public access to judicial records applies even when the information may not be of particular interest to the public. In *Macias v. Aaron Rents, Inc.*, 288 F. App'x 913, 915 (5th Cir. 2008) (unpublished), the Fifth Circuit found that the district court had not abused its discretion by refusing to seal court documents because the concerns the party requesting sealing raised—"the lack of importance to the public and the potential for employer retaliation against litigious employees—could apply to nearly all cases filed in the federal courts, especially those involving Title VII." The court continued: "If we were to decide that the court's determination here was an abuse of discretion, then the same argument could successfully be made by countless plaintiffs. Such a result, however, would be contrary to our statement that 'the district court's discretion to seal the record of judicial proceedings is to be exercised *charily*.'" *Id.* (quoting *Van Waeyenberghe*, 990 F.2d at 848 (internal citations and quotations omitted) (emphasis added)); *see also Jaufre ex rel. Jaufre v. Taylor*, 351 F. Supp. 2d 514, 516 (E.D. La. 2005).

In this case, Udoewa should have initially filed the documents designated as confidential under seal or sought, in advance, the defendants' agreement to file these documents or redacted versions of them in the court's publically accessible document.  His failure to do either is troubling.  But the defendants have not met their burden of showing that all the documents deserve to be filed under seal.

- Exhibit 9 to Docket Entry No. 99 is minutes of the meetings of the Plus4 board of directors. A review of these documents does not show a basis to place them under seal.

- Exhibit 11 to Document Entry No. 99 is a copy of this court's own order and a response to a document subpoena stating that no documents were found.  There is no basis to seal this document.

- Exhibit 14 is an analysis of layoff.  It contains significant amounts of sensitive financial and personnel information, naming individual employees who are not parties to this case.  The information contained in it should remain confidential.  This exhibit is ordered removed from the public record and filed under seal.

- Exhibit 23 is the National Credit Union Association (NCUA) Examiner's Report for Plus4 effective 12/31/2008, and Exhibit 24 is a supplement to that report.  Exhibit 41 is a letter from the Texas Credit Union Department (TCUD) discussing the recent examination of Plus4.  Presumably, this is a reference to the Examiner's Report because the NCUA is copied on the letter.  The NCUA is an independent federal agency that charters and supervises federal credit unions.  The excerpts from the Examiner's Report at issue contain extensive financial information of a sort that is often kept  confidential.  *See Cooper Tire and Rubber Co. v. Farese*, Civil Act. No.

55

3:02CV210-SA-JAD, 2009 WL 514071, at *1 (N.D. Miss. Feb. 27, 2009) (sealing "sensitive financial documents); *Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp.*, No. Civ. A. 97-3012, at *1 (E.D. La. Apr. 17, 1998) (sealing sensitive financial information about individual car dealerships).   The extent of the confidentiality of these reports is unclear.   Chapter 20 of the NCUA Examiner's guide states that the report is a communication between only "the examiner, the credit union, and the NCUA. *Examiner's Guide*, *available at* http://www.ncua.gov /GenInfo/GuidesManuals/examiners_guide/__chapters/chapter20.pdf.,   at   20-1. Chapter 20 also states that only certain statements and findings made by the examiner and placed in the report's "Confidential Section" are for NCUA's internal use.  *Id.* at 20-5.  The motion to seal these records is granted.  These exhibits are ordered removed from the public record and filed under seal.

The defendants asked for sanctions to be imposed on the plaintiff for unilaterally disregarding the confidentiality designations and simply filing the documents with the court.  Given the absence of a provision in the protective order governing the filing of such documents in connection with a motion, this court denies the request for sanctions.

## V.   Conclusion

The defendants' motion for summary judgment is granted.  This suit is dismissed with prejudice.  Final judgment is entered by separate order.

SIGNED on November 15, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

56